# EXHIBIT D

Erik Groothuis
Partner

212 344-5400 Ext. 204
egroothuis@schlamstone.com

**SCHLAM STONE & DOLAN LLP**

26 Broadway, New York, NY 10004
Main: 212 344-5400  Fax: 212 344-7677
schlamstone.com

December 11, 2018

**BY FEDEX**
Coherent Economics, LLC
430 Park Avenue, Suite 2B
Highland Park, IL 60035
Attention: Alan S. Frankel, President

## CONFIDENTIAL – FOR SETTLEMENT PURPOSES

Re: <u>In re Appraisal of AOL Inc. in the Court of Chancery of the State of Delaware (No. 11204-VCG) (the "Appraisal Action")</u>

Dear Mr. Frankel:

This firm represents Verition Partners Master Fund Ltd. and Verition Multi-Strategy Master Fund Ltd., each a petitioner in the Appraisal Action and referred to together as "Verition" in this letter. I write to seek compensation for losses Verition suffered as a result of your firm's breach of contract and tortious conduct in connection with expert services provided by Professor Bradford Cornell in the Appraisal Action. This letter is a pre-suit demand, which is being sent for settlement purposes only to see if this matter can be resolved before litigation.

## BACKGROUND

**A.  Verition's counsel retains Coherent to use Cornell as its valuation expert**

By letter dated December 17, 2015 and accepted on February 10, 2016, Verition's counsel retained Coherent Economics, LLC ("Coherent") to provide expert services in connection with the representation of Verition in the Appraisal Action. Verition was the intended beneficiary of that agreement and Professor Cornell was to be Verition's testifying witness.

In that letter agreement, Coherent confirmed its understanding that Verition's counsel needed Cornell to provide "independent" expert economic analysis in the Appraisal Action.

**B.  Coherent fails to disclose Cornell's bias and disabling conflict of interest**

Unbeknownst to Verition or its counsel, Cornell had actively and repeatedly solicited Verition's litigation opponent, Verizon Communications Inc. ("Verizon"), prior to being retained on Verition's behalf in the Appraisal Action. Among other things, while trying to get retained by Verizon, Cornell had told Verizon that he believed Verition's case was "shitty" and that Verizon had "the better side of the case."

At the time he made those statements, Cornell was affiliated with another expert consulting firm, Compass Lexecon. But when Cornell learned that he had been rejected by Verizon in favor of another Compass Lexecon expert, Professor Daniel Fischel, Cornell switched his affiliation to Coherent and agreed to work for the petitioners. Ultimately, Verizon used his pre-retention communications to its strategic advantage in the Appraisal Action.

The substance of Cornell's attempts to solicit Verizon was never disclosed to Verition or its counsel; had it been disclosed, Verition would never have engaged with Coherent or Cornell.

### C. Cornell's undisclosed communications with Verizon

Based on the records currently in its possession, Verition is aware that Cornell reached out to the firm of Wachtell Lipton, Verizon's counsel in the Appraisal Action, by email on July 10, 2015. In that communication, Cornell pitched himself as a qualified expert for Verizon based on the work he had performed as a valuation expert on behalf of the respondent in another appraisal action in 2014.

In a July 11, 2015 email, Cornell next reached out directly to Verizon to pitch his services as an expert. In that communication, Cornell expressed to Verizon's in-house counsel his views about "what a nuisance these [appraisal] cases can be," and further observed that "[t]hey generally have little merit but are almost becoming a cost of doing an acquisition." He also speculated that Verition's strategy amounted to "legal arbitrage."

On July 28, 2015, Cornell told Fischel that Verizon had "the better side of the case in my opinion and [that Cornell] would not want to loose [sic]" the opportunity to serve as Verizon's expert.

In a separate communication with Verizon's in-house counsel that day, Cornell assured Verizon that he "could not work against" the company. In response, Verizon thanked Cornell and said they were "very glad that [he wouldn't] be appearing against us."

The fact that Cornell did not intend to work against Verizon was later referenced in another email between Fischel and Cornell on July 31, 2015, in which Fischel noted the possibility that the petitioners might want to retain Cornell before dismissing that prospect as something that was "not going to happen."

On August 11, 2015, Fischel told Cornell that he had been asked by Wachtell Lipton whether Compass Lexecon had been hired to represent the petitioners in the Appraisal Action. Fischel related that he had told Wachtell that he "put the approach from the petitioners on hold" pending Verizon's decision. In response, Cornell remarked, "Good news."

Everything then changed when Verizon rejected Cornell. On November 3, 2015, Fischel told Cornell that Verizon had selected Fischel as its expert in the Appraisal Action. Over the next two days, Cornell sent emails trying to find out who was representing the petitioners. On the Sunday morning of November 8, 2015, Cornell sent Fischel the following email, titled "Verizon/AOL":

> Dan,
>
> **Like you I tend to bear grudges.** And though I see you as perhaps the best general expert witness in the country, when it comes to appraisal, particularly for tech companies, I think I am uniquely well qualified. **So when Verizon/Wachtell chose you without even talking to me further that leads to a grudge against them.**
>
> **Consequently, I have had some conversations with plaintiffs.** I don't know if it will go anywhere or if I like the case enough to take it. But if it looks OK, I plan to go forward. I don't want to make a habit of being adverse to [Compass Lexecon], **but I see this as another special case.** I will let you know if anything comes of it.

(emphases supplied)

In a later exchange with Fischel, Cornell stated that his "main concern [in working for petitioners] is that **the plaintiffs have a shitty case** (that is not based on conversation just what I have read online) so **I will have to be careful to avoid letting my grudge lead to a situation where I threaten my reputation.**" (emphases supplied)

In his conversations with Verition's counsel, Cornell, on behalf of Coherent, falsely represented that he had no conflicts working against Verizon and failed to disclose his prior communications with Verizon, its counsel at Wachtell, and Fischel, who became Verizon's expert. As stated above, those communications—all of which were obtained by Verizon's counsel—revealed both the debilitating "grudge" Cornell held against Verizon and his negative assessment of Verition's case, each of which were exploited on cross-examination. Had Verition known of Cornell's bias and that Cornell had slammed Verition's case directly to Verizon, it would never have retained Coherent and Cornell.

**D.     Cornell's pre-retention communications with Verizon surface during the litigation**

Verizon, Wachtell, and Compass Lexecon were each well aware of the Cornell communications and used them to Verizon's strategic advantage. They waited until after experts were disclosed and Cornell had issued his report before springing them on Verition's unwitting counsel—at which point it was too late for Verition to do anything about it.

Thus, Coherent's proffered expert, Cornell, was a ticking time bomb that detonated in the midst of litigation, with devastating consequences for Verition.

**E.     Cornell's undisclosed conflict torpedoed Verition's case**

The unexpected disclosure of Professor Cornell's pre-retention communications with, and grudge against, Verizon wound up ruining Verition's claim. Verizon's initial post-trial brief hammered the point home:

> Shortly after this lawsuit began, Dr. Cornell lobbied hard to be retained by Verizon and AOL, telling Verizon that lawsuits like this were a "nuisance" and a "problem"

and that AOL "has the better side of the case." But when Verizon and AOL hired someone else, Dr. Cornell developed a "grudge" against them and decided to work for the other side.

Similarly, in its answering post-trial brief, Verizon devoted an entire section of 3.5 pages arguing that "Cornell's Analysis Should Be Disregarded Because Of His Bias." In particular, Verizon argued that Cornell's opinion that Verition had a "shitty" case represented his "unvarnished contemporaneous view" that was "more revealing than anything Cornell wrote in his expert reports." (citation and internal alterations omitted)

In sharp contrast, Verition's post-trial briefs could not defend the conflict. Petitioners' opening post-trial brief relegated its discussion of the issue to a footnote, which did no more than refer to Fischel's testimony that he respected Cornell as a scholar and valuation expert. Even worse, petitioners were forced to capitulate the point in their answering post-trial brief: they devoted only a footnote in defense of Cornell, in which Verition, to save face, had to suggest that the court could "use **Fischel's** model as a starting point and add to it . . ." (emphasis supplied)

In other words, due to the damage caused by Cornell's bias being revealed in the midst of the case, Verition's counsel was forced to argue that the court should use the model of the *opposing* expert.

### F.     The court rejects Verition's claims

Unsurprisingly, the court sided with Verizon. The court was charitable to Cornell in declining to expose Cornell's conflict in its opinion. But there was no doubt which expert's opinion formed the foundation for the court's analysis:

> For reasons not necessary to detail, however, the Respondent questioned Dr. Cornell's impartiality in this matter, and the Petitioners seem content to use the DCF model presented by the Respondent's expert as a starting point for my analysis. Accordingly, I start with the DCF valuation provided by that expert, Professor Daniel Fischel, and consider the Petitioners' limited arguments that certain assumption or inputs in that valuation must be changed.

Further, during the trial, the court ruled that Verizon's questions regarding Cornell's incapacitating bias were a proper subject of inquiry because they did "make a difference with Professor Cornell because the argument is going to be that it goes to his motive here," thus demonstrating that the court credited this argument.

Ultimately, the court applied a couple of minor adjustments to Fischel's model that resulted in a fair value determination of $48.70 per share, far closer to Fischel's valuation of $44.85 per share than to Cornell's valuation of $68.98 per share.

## CLAIMS

**Breach of contract**

The above-described communications between Coherent's agent and Verition's litigation adversary make painfully clear that Coherent did not provide "independent, expert economic analysis and opinions" to Verition's counsel, as the engagement letter required. In fact, Cornell and Coherent had an undisclosed bias and a disabling conflict that surfaced at the worst possible time in the litigation, with devasting effects on the petitioners' case.

We note that the "Standard Commercial Terms" appended to the Coherent contract containing a limitation of liability provision are unenforceable as a matter of public policy under Delaware law where, as here, the facts show fraud in the inducement. *See, e.g., Petroleum v. Magellan Terminals Holdings, L.P.,* 2015 WL 3885947, at *24 (Del. Super. Ct. 2015) ("[i]t is undisputed that parties cannot absolve themselves for their own conduct amounting to fraud.").

**Fraudulent inducement and concealment**

Due to Coherent's failure to disclose Cornell's admitted bias and his dismissive remarks to Verizon's counsel about Verition's case, Verition was fraudulently induced to enter into the contract with Coherent. Under Delaware law, a claim for fraudulent inducement requires: "(1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damages to the plaintiff as a result of such reliance." *CSH Theatres, LLC v. Nederlander of San Francisco Associates,* 2015 WL 1839684106, at *21 (Del. Ch. Apr. 21, 2015).

All of these elements are met on the facts here. First, Coherent falsely represented that Cornell would provide "independent" expert services, yet knew that he was anything but independent. Coherent may not assert that it too was unaware of Cornell's conflict, since Cornell was Coherent's agent and his representations and/or failures to disclose were made in the scope of his agency. Next, Coherent and Cornell made such representations to induce Verition to enter into the contract. Indeed, Cornell himself admitted that his "grudge" against Verizon motivated him to seek the opportunity to represent Verition. Last, Verition justifiably relied on those representations in engaging Coherent and suffered significant damages as a result. As set forth above, the court reached a valuation that was significantly lower than what Verition would have received if Cornell's analysis had been credited.

The same facts show that Cornell, on behalf of Coherent, fraudulently concealed material facts to the detriment of Verition. Under Delaware law, a fraudulent concealment claim requires "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) That the defendant acted with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149 (Del. 1987). Courts have recognized

6 | Page

that a close business relationship can evidence the "type of special relationship giving rise to a duty to disclose." *AgroFresh Inc. v. MirTech, Inc.*, 257 F.Supp.3d 643, 664 (D. Del. 2017); *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007) (duty to disclose may arise from custom or course of dealing between parties).

Coherent is likewise liable for damages caused by Cornell's active concealment of the truth when asked whether he had conflicts and falsely denied it. *See Nicolet, Inc,* 525 A.2d at 149.

### Aiding and abetting fraud

Even if Coherent were not the primary actor perpetrating the fraud, it aided and abetted the fraud as either an active participant, or provided substantial assistance in support of Cornell's fraud. Under Delaware law, there are three elements to an aiding and abetting fraud claim: "(i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance." *PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *15 (Del. Ct. Ch. 2018). Coherent was aware of Cornell's tortious conduct—either through its actual or the imputed knowledge of its agent Cornell—yet nonetheless allowed him to affiliate with Coherent to secure Verition's valuable business.

### Professional malpractice

Coherent's conduct also constitutes professional malpractice. Cornell's CV on Coherent's website touts, *inter alia*, his affiliations with the American Finance Association ("AFA") and the American Economic Association ("AEA"). The AFA's Code of Professional Conduct and Ethics requires that "[i]n research, teaching, practice, and service, financial economists should be alert to situations that might cause a conflict of interest or the appearance of a conflict of interest, and take appropriate action to prevent a conflict of interest *or disclose it to appropriate parties*." ¶ 4(a) (emphasis added). Similarly, the AEA's Code of Professional Conduct requires, among other things, "disclosure of real and perceived conflicts of interest."

Cornell and Coherent failed to make these required disclosures, in violation of the reasonable standards of care expected of those in their field. *See, e.g., Gunn v. McKenna,* 2014 WL 7466521, at *3 (Del. Super. Ct. 2014) ("In suits for professional malpractice [] Plaintiff need show merely that the Defendant did not conduct himself according to a standard of care required of professionals in the field.").

### **DEMAND**

We write to give Coherent the opportunity to remedy this before Verition commences litigation.

In the complaint to be filed, Verition will seek to have Coherent held jointly and severally liable for approximately $25.2 million, which represents the difference between the fair value of Verition's shares according to Coherent's expert Professor Cornell and the value Verition received from the court, plus interest thereon of $5.5 million, and any other damages to which Verition is entitled at law or equity.

7 | Page

We note that under Delaware law, Verition is entitled to its benefit-of-the-bargain damages for both contract and fraud claims. Verition is prepared to prove that had Cornell's arguments been presented on equal footing with Fischel's arguments and therefore been given the hearing they deserved at trial, instead of swept under the rug by Verition's own counsel, the court's valuation would have been materially higher.

However, in an attempt to avoid litigation and the prospect of the embarrassing disclosure of Coherent's role in this fiasco, Verition is willing to negotiate during a short window.

In any event, we direct Coherent to preserve all documents pertaining to the Appraisal Action, the retention of Professor Cornell, and the above-described issues. We expect Coherent to place a litigation hold as of the date of receipt of this letter.

This letter is written subject to and without waiver of our clients' rights, all of which are reserved. I look forward to your response. Please direct all communications concerning this matter to my attention. If we do not hear from you within 10 days, we have been instructed to commence legal action against Coherent.

Sincerely,

Erik Groothuis

cc: Verition